IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA FLEET,<br>    **Plaintiff,**<br><br>    v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>    **Defendant.** | )<br>)<br>)<br>)<br>) 2:14-CV-01419-TFM<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

June 3, 2015

**I. Introduction**

Patricia Fleet ("Plaintiff") brings this action for judicial review of the decision of the Acting Commissioner of Social Security, which denied her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403. Pending before the Court are the parties' cross-motions for summary judgment (ECF Nos. 6, 9). The motions have been fully briefed and are ripe for disposition (ECF Nos. 7, 10).

**II. Background**

 **A. Facts**

Plaintiff was born on June 11, 1946, and graduated from high school in 1964. (R. 143-162). She has prior work experience as a hostess and retail sales attendant, but she stopped working in August 2002 "because of [her] condition(s)."[1] (R. 162-63). She alleges disability as

---

1. In her opinion, the ALJ stated that Plaintiff "indicate[d] that she worked on a full-time basis from May 2002 through May 2011 as a hostess, earning $7.25 an hour, which would be considered substantial gainful activity." (R. 19). In support of that assertion, the ALJ cited page 3 of Plaintiff's Disability Report. (R. 19). Plaintiff did in fact indicate in the Disability Report that she worked as a hostess and sales associate from May 2002 through May 2011. (R. 163). However, this obviously appears to have been a mistake, as on the prior page, Plaintiff stated that she had stopped working on August 30, 2002. (R. 162). She said the same thing at the hearing. In

1

of December 31, 2007, due to fibromyalgia, asthma, and several other alleged impairments. (R. 162). She last met the insured-status requirement for DIB on December 31, 2007. (R. 14). Thus, the period under consideration is August 30, 2002, through December 31, 2007.

The medical evidence from that period is rather sparse. Plaintiff underwent a neurosurgical consultation with J. William Bookwalter, III, M.D., on January 21, 2002, upon referral from her primary care physician, Mary Jo Houston, M.D. (R. 238-39). Dr. Bookwalter noted that Plaintiff had been diagnosed with fibromyalgia, though it is not clear from the record when this diagnosis was first made. (R. 238). She complained of bilateral shoulder pain and upper extremity discomfort, particularly numbness and tingling in her left arm. (R. 238). She also complained of headaches. (R. 238). On examination, Plaintiff displayed "pretty good range of motion of her neck and no real spasm." (R. 238). Likewise, "[h]er motor exam was normal in her upper extremities" and she had "no sensory loss." (R. 238). Furthermore, Dr. Bookwalter reviewed a recent MRI and noted that it "doesn't look bad." (R. 239). Though he did observe "some degenerative changes," Dr. Bookwalter disagreed with the assessment of one of Plaintiff's other doctors that there were "tiny focal midline herniation at C5-6." (R. 239).

Following this consultation with Dr. Bookwalter, there is a four-year gap in the record. Plaintiff finally returned to Dr. Bookwalter's office in June 2006, after a sinus CT scan showed a lesion on her left frontal lobe. (R. 235). Dr. Bookwalter reviewed the results of the CT scan and found that the lesion was "basically a very small questionable meningioma," which was "in no way causing her right-sided body pain symptoms." (R. 235). On examination, Plaintiff had full range of motion, normal muscle strength, symmetric reflexes, and no sensory changes. (R. 235).

---

any event, contrary to what she wrote in the above-quoted portion of her decision, the ALJ found elsewhere in her decision that Plaintiff had not engaged in substantial gainful activity during the period between her alleged onset date and her date last insured. (R. 14).

She was prescribed Medrol (a steroid) and Motrin for her neck pain and advised to follow-up in a few weeks. (R. 235).

Plaintiff next saw Dr. Bookwalter on July 10, 2006, at which time he noted that she was "better on the steroids and nonsteroidals suggesting that her symptoms regarding her neck are really related to degenerative disc disease." (R. 228). He suggested that she attempt to lose weight and also suggested sending her to a physiatrist (a rehab physician) to manage her degenerative disc disease. (R. 228).

To that end, Plaintiff was referred to Gin-Ming Hsu, M.D., at East Suburban Rehabilitation Associates, Inc. ("East Suburban"). (R. 492). During her initial appointment on August 17, 2006, Plaintiff complained of right-sided chronic neck pain, which she rated 5/10 on average, along with intermittent numbness in her hands and arms. (R. 492). She had trouble sleeping because of the pain. (R. 492). Nevertheless, she reported that she worked part-time as a bridal consultant. (R. 493). According to Dr. Hsu, Plaintiff received some pain relief with the application of heat. (R. 492). Motrin also gave her some relief, and Medrol produced "good results" – though the latter drug had been discontinued. (R. 492). Upon exam, Plaintiff's range of motion of was limited, but she displayed full strength in her upper extremities. (R. 493). Dr. Hsu recommended that Plaintiff continue taking Motrin and also that she undergo trigger-point injections followed by physical therapy ("PT"). (R. 493).

Plaintiff underwent her first trigger-point injections at East Suburban on August 28, 2006. (R. 242-43). Her symptoms were unchanged from her last visit. (R. 242). Following this appointment, she was ordered to begin PT. (R. 423). The next month, she returned to East Suburban for a follow-up, reporting that her first PT session had been "very helpful." (R. 240). Ambien also reportedly helped. (R. 240). Plaintiff received another round of trigger-point

injections, and was instructed to continue undergoing PT two to three times per week and to obtain a Transcutaneous Electrical Nerve Stimulation ("TENS") unit. (R. 241).

Plaintiff returned to East Suburban in November 2006, at which time she reported experiencing pain relief from her PT and TENS unit. (R. 486). She also reported that her trigger-point injections and Lunesta were both "wonderful." (R. 486). She described experiencing side effects from Lunesta, but she said that she could "deal with it." (R. 486). And although she said that she was "really tired all the time," she was still working part-time in bridal sales. (R. 486).

Plaintiff returned to Dr. Hsu's office for additional trigger-point injections in January 2007. (R. 484). She still complained of neck and shoulder pain radiating into her right hand and right side. (R. 484). Her range of motion was limited, but her stability and muscle strength were both normal, as was the rest of her physical examination. (R. 484). She reported that her trigger-point injections were providing "fairly good" relief. (R. 484). Likewise, she considered her TENS unit "effective" and said she got temporary relief from PT. (R. 484).

In April 2007, Plaintiff reported that her latest round of trigger-point injections had not been as effective as previous rounds, though she still received "some relief." (R. 482). She complained that she felt very exhausted, as her fibromyalgia and the neck pain related thereto had worsened. (R. 482). However, her physical examination was largely the same as it had been in prior months (i.e., unremarkable). (R. 482). Dr. Hsu recommended that Plaintiff continue receiving trigger-point injections and taking Pamelor. (R. 483).

At her next appointment at East Suburban, in August 2007, Plaintiff reported that the pain had been especially bad. (R. 223). Once again, she displayed a slightly limited range of motion, but the rest of her physical examination was unremarkable. (R. 223). Plaintiff was continued on Ambien, but her Nortriptyline was discontinued. (R. 224). In its place, she was prescribed

Effexor. (R. 224). In addition, she was instructed to start undergoing aqua-therapy and referred to a psychologist for her chronic pain and also for stress management. (R. 224).

In late August, Dr. Bookwalter referred Plaintiff for a neurologic evaluation with J. Stephen Shymansky, M.D. (R. 528-29). During the evaluation, Plaintiff complained of constant pain in her face, arm, and leg. (R. 528). She also reported having frequent, severe coughing fits. (R. 528). A brain CT scan showed signal changes in the subcortical white matter. (R. 528). On examination, Plaintiff displayed mild, generalized weakness in all muscles tested. (R. 529). Her reflexes, however, were in the normal range. (R. 528). In closing, Dr. Shymansky noted that Plaintiff had "an unusual constellation of symptoms which may or may not be explained on a neurological basis." (R. 529). Because of the results of the CT scan, Dr. Shymansky ordered Plaintiff to undergo a hyper-coagulation stroke profile; multiple autoimmune diseases tests; an echocardiogram test, Holter monitoring, and a carotid ultrasound study. (R. 529). He also prescribed Lyrica for her fibromyalgia-related facial pain. (R. 529).

At an October 22, 2007, follow-up appointment at East Suburban, Plaintiff described suffering from "intermittent aches." (R. 219). She had been receiving some pain relief from relaxing her shoulders and neck, as well as from her aqua therapy and trigger-point injections. (R. 219). She was advised to continue on the same treatment regimen. (R. 220).

Plaintiff returned to Dr. Shymansky's office on November 8, 2007, to discuss the results of her various diagnostic tests. (R. 527). All of the test results were normal. (R. 527). However, upon reviewing the results of a recent MRI, Dr. Shymansky observed that Plaintiff had moderate disc herniation at C-6 with some osteophytic changes. (R. 527). Dr. Shymansky instructed Plaintiff to continue seeing Dr. Hsu and taking Lyrica for pain control and to contact him if any new neurologic symptoms developed. (R. 527).

B.   **Procedural History**

Plaintiff protectively filed an application for DIB on January 25, 2012, alleging disability as of August 30, 2002. (R. 143). Her claim was denied at the administrative level, and subsequently she filed a written request for a hearing. (R. 86). A hearing was held on January 15, 2013, before Administrative Law Judge ("ALJ") Paula Wordsworth in Johnstown, Pa. (R. 25-57). Plaintiff was represented by counsel and testified at the hearing, as did an impartial vocational expert ("VE"). (R. 40-93).

On February 4, 2013, the ALJ issued a decision, which denied Plaintiff's claim for benefits. (R. 20). She found that Plaintiff's fibromyalgia constituted a severe impairment, but nevertheless concluded that she retained the residual functional capacity ("RFC") to perform light work with the following additional limitations: she was limited to "unskilled work with frequent climbing of stairs and ramps, occasional climbing of ropes, ladders, and scaffolds, and occasional bending, balancing, crouching, stooping, kneeling and crawling." (R. 15). Based on the VE's testimony, the ALJ then determined that Plaintiff could return to her past relevant work as a hostess, which is considered unskilled work performed at the light exertional level. (R. 19). Thus, the ALJ held that Plaintiff was not disabled within the meaning of the Act. (R. 20). The ALJ's decision became the final decision of the Acting Commissioner on August 27, 2014, when the Appeals Council denied Plaintiff's request for review. (R. 1-5). This appeal followed.

III.  **Legal Analysis**

A.   **Sequential Evaluation Process**

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247

F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1). When deciding whether a claimant is disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work that exists in significant numbers in the national economy. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

### B. Standard of Review

The Act strictly limits the Court's ability to review the Commissioner's final decision. 42 U.S.C. § 405(g). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, the Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

C.  Discussion

Plaintiff argues that the ALJ's failure to give controlling weight to two forms – a February 2012 medical source statement completed by her primary care physician, Dr. Houston, and a December 2012 physical capacity evaluation form signed by Dr. Houston – contradicted the treating-physician rule. For her part, the Acting Commissioner maintains that the ALJ's decision is supported by substantial evidence and should therefore be affirmed. The Court agrees with the Acting Commissioner.

1.  February 2012 Medical Source Statement

In her February 22, 2012, medical source statement, Dr. Houston opined that Plaintiff could frequently lift and carry two to three pounds, occasionally lift and carry 10 pounds, and stand and walk for one to two hours in an eight-hour workday. (R. 362). She also had a limited ability to push and pull with both her upper and lower extremities, and while she could occasionally bend, she could never kneel, stoop, crouch, balance, or climb. (R. 363). Furthermore, in Dr. Houston's view, she was limited in her ability to reach. (R. 363). No sitting limitations were noted, however. (R. 362). The ALJ acknowledged Dr. Houston's opinion, but declined to afford it any weight since "it was completed well after the date last insured of December 31, 2007, and does not include any supporting medical evidence for the relevant period at issue." (R. 19). The ALJ did not err in assigning no weight to this medical source statement. Under the regulations, Plaintiff was required to establish that she was disabled on or before the expiration of her insured status on December 31, 2007. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990); *Kane v. Heckler*, 776 F.2d 1130, 1131 n.1 (3d Cir. 1985); *Kelley v. Barnhart*, 138 F. App'x 505, 507 (3d Cir. 2005). Dr. Houston's February 2012 medical source statement was generated well after Plaintiff's insured status

expired – more than four years, to be exact – and did not purport to address Plaintiff's level of functioning during the relevant time period (August 30, 2002, through December 31, 2007). Thus, because this opinion did not relate back to the relevant time period, it was irrelevant and properly rejected by the ALJ. *See Tecza v. Astrue*, No. CIV. A. 08-242 ERIE, 2009 WL 1651536, at *10 (W.D. Pa. June 10, 2009) (collecting cases where courts held that opinions post-dating the claimant's insured status were irrelevant unless the evidence related back to the time period under consideration); *Van Gilder v. Colvin*, No. CIV.A. 12-1037, 2013 WL 1891345, at *7 (W.D. Pa. Apr. 16, 2013), *R&R adopted*, No. CIV.A. 12-1037, 2013 WL 1891350 (W.D. Pa. May 6, 2013) (explaining that "[e]vidence is relevant to a claimant's case only if it sheds light on his or her condition during the period of time in question").

## 2. December 2012 Physical Capacity Evaluation

On December 13, 2012, Dr. Houston signed a physical capacity evaluation form at the behest of Plaintiff's attorney, which indicated that Plaintiff could stand and walk for two hours in a workday, sit for two hours in a workday, and repeatedly lift zero to five pounds. (R. 506). The form also indicated that Plaintiff would often require additional breaks during a workday due to her pain, fatigue, headaches, and stiffness, and experienced six to eight bad days per month, during which her symptoms were increased and would therefore prevent her from working a full eight-hour workday. (R. 506). The last line of the form states that "these symptoms and limitations have existed since 2006." (R. 506).

Plaintiff is correct that the ALJ did not discuss or cite the December 2012 form in her decision. But the Court cannot fault her for not doing so, even though, unlike the February 2012 report, this one did purport to relate to the period under consideration. "[A]n ALJ may not reject *pertinent or probative* evidence without explanation," but she is "entitled to overlook" evidence

that is not "pertinent," "relevant" or "probative." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008) (emphasis added). "It may be inferred that the ALJ has implicitly rejected such evidence where not specifically discussed." *Liggitt v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1024, 2011 WL 2458054, at *12 (W.D. Pa. May 20, 2011), *R&R adopted*, No. CIV.A. 10-1024, 2011 WL 2445861 (W.D. Pa. June 16, 2011) (internal citation omitted).

To the extent that the December 2012 physical capacity evaluation speaks to Plaintiff's condition after the relevant time period, it was irrelevant and thus could be rejected without explanation. To the extent that it relates to the relevant time period – and it does in fact state that the limitations discussed "existed since 2006" – the ALJ was nevertheless entitled to overlook it because of its negligible probative value. First of all, our Court of Appeals has repeatedly emphasized that forms that require a doctor to "'check a box or fill in a blank,' rather than provide a substantive basis for the conclusions stated, are considered 'weak evidence at best' in the context of a disability analysis." *Smith v. Astrue*, 359 F. App'x 313, 316 (3d Cir. 2009) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). Dr. Houston was not even required to "check a box or fill in a blank" on the form in question. Rather, it appears that Plaintiff's counsel completed the form, based on Plaintiff's subjective allegations, and Dr. Houston was only required to sign and date it.[2] Thus, the reliability of this form is even more suspect than the typical form reports seen in S.S.A. cases, which at least require a doctor (or his or her staff) to do some leg work on behalf of a patient.

In addition, as the ALJ observed when discussing the February 2012 medical source statement, the December form was not supported by any medical evidence from the relevant time

---

2. The form states: "Your patient told us that their functioning is affected in the following manner by their medical conditions. If you agree that their description is medically reasonable and consistent with their reports to you, please sign this form." (R. 506).

period. Indeed, there is no evidence that Plaintiff treated with Dr. Houston for her fibromyalgia during the period at issue. After Dr. Houston referred Plaintiff to Dr. Bookwalter in 2002, there is a four-year gap in the record, until Plaintiff began seeing Dr. Bookwalter again in the middle of 2006. Even after the record picks back up, the notes from Plaintiff's visits with Dr. Bookwalter and Dr. Hsu through the end of 2007 do not support the limitations set forth in the February 2012 form signed by Dr. Houston. Although Plaintiff did display a somewhat limited range of motion throughout this time period, the other facets of her physical examinations were largely unremarkable, month in and month out. Furthermore, as the ALJ pointed out, Plaintiff was treated conservatively and, by her own estimation, her treatments, which included prescription medications, trigger-point injections, a TENs unit, and PT, seemed to be working well. Accordingly, because the February form was less-than-reliable evidence of Plaintiff's condition and because "[o]verwhelming evidence in the record," *Johnson*, 529 F.3d at 204, further diminished its negligible probative value, the ALJ did not err in failing to discuss or cite this form in her decision.[3]

---

3. Plaintiff also argues in a footnote that the ALJ committed "another possible error" that, by itself, requires a remand. Pl.'s Br. in Supp. Mot. Summ. J. 11 n.2, ECF No. 10. Specifically, she contends that "that [the ALJ's] assessment demonstrates a lack of understanding of the medical evidence and/or a blatant disregard for the requirements of SSR 12-2p, which describes Agency policy for evaluation of fibromyalgia." *Id.* This argument is without merit. The sections of SSR 12-2P on which Plaintiff relies focus on the type of evidence required to establish a medically determinable impairment ("MDI") of fibromyalgia. SSR 12-2P, 2012 WL 3104869, at *2-3 (S.S.A. July 25, 2012). In this case, although the ALJ did note that Plaintiff did not show regularly show at least 11 "trigger points" on physical examination, she nonetheless found that Plaintiff's fibromyalgia constituted a severe impairment. Therefore, it is of no moment whether the ALJ properly analyzed the diagnostic criteria for fibromyalgia. Applying any criteria, she found that Plaintiff's fibromyalgia was not only an MDI, but also a severe MDI. Moreover, the Court finds that the ALJ complied with the requirements of SSR 12-2P when determining whether Plaintiff's fibromyalgia was so severe as to be disabling. *See id.* ("Once an MDI is established, we then evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for

**IV.     Conclusion**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that she faces in seeking gainful employment. Under the applicable standard of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and her conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Therefore, the Court will **GRANT** the motion for summary judgment filed by the Acting Commissioner and **DENY** the motion for summary judgment filed by Plaintiff. An appropriate Order follows.

                                                                                    McVerry, S.J.

---

work."). Thus, contrary to Plaintiff suggestion, remand is not required so that the ALJ may comply with the requirements of SSR 12-2P.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PATRICIA FLEET,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:14-CV-01419-TFM |
| | ) |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) |
| Defendant. | ) |

## ORDER

**AND NOW**, this 3rd day of June, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Acting Commissioner's MOTION FOR SUMMARY JUDGMENT (ECF No. 6) is **GRANTED**, and Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 9) is **DENIED**. The Clerk shall mark this case **CLOSED**.

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Judge

cc: **Lindsay Fulton Osterhout, Esq.**
Email: lindsay@mydisabilityattorney.com

**Christy Wiegand, Esq.**
Email: christy.wiegand@usdoj.gov

(via CM/ECF)